The Honorable, the Judges of the United States Court of Appeals for the Fourth Circuit All right, be seated please The next case we're going to hear is Rhoads v. Riddell and Mr. Lindeman will hear from you Thank you, Your Honor. May it please the Court, Andrew Lindeman on behalf of the appellants Erik Riddell and Jessica Whitaker Your Honors, this is a second prong qualified immunity appeal The issue before the Court is whether the conduct that was expected of Lieutenants Riddell and Whitaker was clearly established back in May and June of 2019 The plaintiff's theory in the case was ultimately that the appellee had a medical issue that worsened over the course of her one month at the Aiken County Detention Center She was undergoing ongoing medical care by the medical staff, both the nurses and Dr. Williams, who were previously defendants in this case And the record will show, and I think it's undisputed, in fact, a lengthy recitation of the medical history during that 30-day stay at the Aiken County Detention Center that the plaintiff had at least 20 encounters with medical personnel during those 30 days, and that's not even included How many did she have during the time she was in solitary confinement? She had numerous during that Could she access the kiosk to ask for medical assistance while she was in solitary confinement? The kiosk was available to her, and also the testimony was that one of the correctional officers actually assisted her in saying the sentences Judge Niemeyer just said something I thought she said it was not available when she was there Her testimony is that. That is an issue in dispute, but of course this is a second prong analysis A minute ago you said the facts were undisputed Well, what I was telling the court was that the medical history is contained in the complaint And what I think is very important to court to recognize, in addition to those 20 encounters, there were also numerous encounters, particularly during the period Well, I don't think we have jurisdiction to review facts that are disputed, the disputes of fact We've explained in many cases, but we just came out recently in Barracks v. Wright and explained it pretty explicitly That under Johnson, the Supreme Court case in Johnson, we're not to review district court's dispute of facts In concluding that summary judgment was unavailable What we are able to conclude in that context is if we take all the facts alleged in the light most favorable to the plaintiff Would the defendants be entitled to immunity And if those facts, if immunity couldn't be awarded then, then we'd send it back for resolution of the facts And I recognize that, your honor, and that's why I If you look at the nature of how the appeal was postured and what I just stated in my opening remark to the court This is a second prong analysis So the question here Then you have to take all the facts the way she has alleged them That's correct And determine whether there would be immunity under that And that starts getting sort of difficult for you if you have to take them on that basis Because she alleges some pretty difficult circumstances I mean, this growth on the side of her head was the size of, she said, the size of a grapefruit And that's pretty large for the higher-ups to say that, oh, that's just self-infliction Well, ultimately, the key fact in this case, which is undisputed, is the medical care that was provided and was ongoing To finish the point I was going to make, in addition to those 20 encounters, multiple times a day, even after she was put in segregation But you're not arguing that there's an immunity granted to the officers because the medical people were looking at her? That's what we're asserting We're asserting that because there's ongoing medical care, that the clearly established law What if the medical care has gaps in it and the officers see conditions that they should be addressing? I mean, that's her theory Her theory is she's in solitary confinement She doesn't have a kiosk to alert And at that point, it was getting worse in that the officers did get summoned And they spoke up the line to someone, I don't remember who it was And he said, oh, that's just self-inflicted and didn't take her to the hospital Or didn't get her medical treatment at that point And at that point, she said her cyst was the size of a grapefruit Well, she had just been seen by Dr. Williams on May 23rd Did he report a cyst the size of a grapefruit? Dr. Williams diagnosed her with a hematoma and prescribed medication as well as warm compresses Ultimately, and again, this is a key point Even while she was in segregation, she received medication And so during MedPass, that was provided by a nurse But she had ongoing complaints and ongoing symptoms she complained about My only problem is you may be absolutely right The problem is a little bit of a structural problem Is that when we have a summary judgment and the district court concludes there are disputes of fact We can't review that issue What we can do is we can re-look at the record and say, okay, we'll take the facts in a light most favorable To the plaintiff, which is not a real statement of facts Because we don't know how they're going to be resolved when a fact finder resolves them But you may be absolutely right But she tells some notion of abandonment And nobody gave her attention And she fell, I don't remember all the personal symptoms But they were pretty tough to ignore And she's not alone in that telling And there are two other correctional officers that support her recounting of the facts But again, if you look at Joint Appendix page 20 The plaintiffs go through the medical care that was provided May 28th she was seen by personnel That's perfectly fine, but that doesn't help the portions where medical care was needed and wasn't given She had the two officers view her And they thought something needed to be done They reported up the line, didn't they? They reported, the allegation is yes, that they reported up the line And what did they report? They reported that there was, obviously that she had a protrusion on the side of her head And that they thought that she needed medical care And that they did not believe it was self-inflicted Those are the allegations Sure, but of course, ultimately to Lieutenants Rydell and Whitaker She was receiving ongoing medical care It is undisputed that she was receiving it As I indicated, she was seeing a nurse on med pass at least twice a day And again, this is even after she was An officer saw a prisoner, inmate, with a broken leg Compound broken fracture And the nurse said, here, take some Advil And that will be alright, it will heal eventually Does that relieve the officer of reporting this further And seeing that the leg gets reset and taken to the hospital? Well, if it is absolutely clear that the care is not being provided Or if no care is being provided, such as what occurred in Ico In this particular case, to these two lieutenants She was receiving ongoing care There would be an expectation, and I would submit a very dangerous one For, to expect non-medically trained personnel Such as Rydell and Whitaker To second guess and override the decision They were making an observation that they personally saw And they thought that this woman needed help And they reported it to their superior And the superior says, oh, it's self-inflicted What did he say? The allegation was one of the nurses said it was self-inflicted There's no allegation that any of the officers said it was self-inflicted And that ended the inquiry by those officers, right? Ultimately, they recognized, and it's undisputed That they were receiving continuing care She had just seen the doctor She was ordered for a CT scan on the 28th of May And so, the point of our motion And the point of our position Is that there is no clearly established law Either in this circuit, and I couldn't find a case anywhere And certainly none has been cited to this court Finding that correctional officers When there's recognition of ongoing care That's a difference between Ico Or a difference between Cooper versus Dykes Where the medical care was over or never existed to start with That there would be an expectation for the correctional officers Again, non-medically trained To override and second-guess the decision of the medical providers And to attempt to provide a second or different course of treatment Can I ask you about that? Because I think you've emphasized This is a second-prong qualified immunity appeal It's only about whether, if the facts are As the district court found a jury could conclude they are Was the right clearly established So it really restricts what we have in front of us And what we can consider And the district court said a jury Could conclude that the defendants knew That their inaction Posed an unjustifiably high risk of harm Even though she was receiving medical care So that's the Eighth Amendment A jury could find that these defendants knew Even though the plaintiff was receiving medical care That by doing nothing They were creating an unjustifiably high risk of harm So we have to then ask Was it clearly established That there's a right to do nothing in that scenario? I understand that to be the right question And the theory, and I agree with the way you postured that The theory is that what they should have done Was to seek an alternative course of action Sought additional or different medical care for Ms. Rhodes And there is no constitutional duty to do so And there's no case holding that they should do so So even if they recognize or thought to themselves Maybe this care is deficient It's really not within their realm Not maybe, even if they knew that doing nothing Posed an unjustifiably high risk of harm It was not clearly established that they Were required to do anything other than nothing Well of course recognize too And that's one of the things that's challenging in this case Is it was analyzed on reconsideration By the district judge Under the Short v. Hartman case Which was not in existence in 2019 Right, but she did both, right She did the Short analysis And she did the Eighth Amendment analysis And said that they A jury could find they actually knew That there was an unjustifiably high risk of harm That to me is the hold up here Once we have that And they take no steps at all To do anything But what's the expectation? What are those steps? That's where they issue Well that's your problem, right It's because in every case that we have Precedent wise Something happened, right Anything at all And then the question is Well were they constitutionally required To do something other than what they did But it seems that there definitely is precedent Saying they're constitutionally required To do something Okay, and so then the question is Judge Rushing What is it that they're supposed to do? There's no case law There's no authority Telling these officers What it is they're supposed to do There's case law Like IKO What does an officer do When he sees somebody in a cell With a broken leg? He summons medical care And in this particular case And there is ongoing medical care At this point either They just left her No, they didn't leave her She was receiving ongoing medical care No, I'm talking about Let's stay with this factual scenario Where she reports That she complained The officers shared her view Reported it upline And nothing was done That's her statement That may be her statement But the record shows And again, the plaintiff's own pleading show That she was seen by medical On the 28th of May On the 29th She received medication on the 30th So she had interaction with nurses On those days She continued to get medication By the MARs On the 1st And on the 2nd She was seen twice But before she was ultimately Sent to the hospital So there was ongoing medical care What date was she sent to the hospital? On June 2nd, 2019 And what was the last date She had medical care? On that particular date She fainted earlier that day That she was seen by medical And then she ultimately Had a second episode During the afternoon And the decision was made By the medical personnel To send her to the hospital And she was seen By medical personnel Because at that point She had fainted twice that day And was vomiting And running a fever Well, you know The issue again is And those things had happened before That wasn't the first time That's right, but And the question is Can the officers stand by When they know there's medical care needed And do nothing And she alleged that they did nothing That the two officers Thought something should have been done And they reported And as a result of their report to a superior I didn't think they reported just to a nurse I thought they reported to somebody else No, it was the nurse that alleged Supposedly that she was self-inflicting Not the officers Okay, yeah, but Who did the officers report their claim to? The evidence is that they reported it To both of the lieutenants But the lieutenants And what did the lieutenants say then? The lieutenants knew at that point What did they say to the officers? Ultimately No, at that point The two officers responded Lieutenant Rydell allegedly indicated to Deputy Kelly That they can't override medical And ultimately That's not right, right? No, I would agree that that's right I think that's the focus of this case He says it's right You think it's right Yeah, I believe that you cannot expect And in fact, Miltier v. Boer No matter what, no matter what Well, particularly Unless it's something just absolutely obvious Like somebody's bleeding out Like a grapefruit-sized thing On the side of somebody's head That's causing them to vomit and faint And pass out But the record shows you The officers observed it She was being treated for that It was dying Doesn't this go to the question of deliberate indifference, though? It seems like your argument to us this morning Is just saying A jury could find that because There were medical professionals involved The officers weren't being deliberate indifferent, right? They didn't know something else needed to happen They were relying on medical That's correct Which a jury could totally believe But that is the prong you keep telling us Is not in front of us The prong that's in front of us is If they knew that they needed to do something Other than what medical was doing And still they didn't Is it clearly established That that violated the Constitution? That's the question That's correct So the question as we posed it Was whether or not there was a constitutional duty When there's knowledge that someone is receiving Ongoing care for a medical issue And that's undisputed in this case That they had a constitutional duty To second guess or override the medical personnel And attempt to seek alternative care When they know When they know that the medical care is not adequate When they know that something else needs to be done Do they have an obligation to do something else? That's the question We have precedent holding non-medical officers liable Right But you have precedent holding non-medical officers liable When there's no medical care being provided As an ICO Or when the medical care occurred in the past And is not ongoing And additional problems arise Which is Cooper v. Dykes There is no case that I'm aware of And none has been cited in this court Where the officers are aware That there's ongoing medical care For a medical issue Which obviously they're not trying to be able to do So you don't ask the right question You keep positing the safety Of relying on medical care The question is when an officer Believes that something needs to be done And sees that something needs to be done Two officers report That there's something serious going on And then they're told Don't worry about it They did nothing Now the question is This is a joint effort This is not a These officers have an independent Constitutional duty to make sure That medical care is provided And if they see it's not being provided They have to do something And that's her version That may not be the right version But you have to give her credit At this stage for her version Don't you? Well, I disagree with you, Honor Because again It's undisputed in the case That she was receiving Ongoing medical care And in fact on May 28th A CT scan had been ordered Obviously it was ordered For several days post But The record clearly shows And I see my time's up Why don't you bring it back on rebuttal Thank you Did you say your name was Linda Baum or Linda Menn Linda Menn That's what I thought Mr. Lewis May it please the court Will Lewis along with my colleagues Mr. Brink Henson and Dixie McCollum On behalf of Mrs. Rhodes Your honors, I think the questions That were posed by frankly all of you Gets right to the point But to drill down on this On this second prong analysis And this immunity that's being Positive by my friend Mr. Lindemann Just because medical is consulted Was disposed of actually by this court In short If you go into the opinion in short And you actually go to page 614 One of the arguments in that Was the fact that the nurse in the short case Made a finding that there was no suicide risk And so the non-medical defendants In that case said, well I can rely on that to do nothing But there were obvious things in front of them Saying that they were a suicide risk And they did nothing And what this court said was They can still be liable for their own actions Because holding otherwise would shield Non-medical defendants From liability whenever Medical personnel is consulted This was the conversation that you were having With Mr. Lindemann is, well what if they see it With their own eyes In this case it's not just doing nothing Judge Rushing, it's actually worse So what happened in this case was The nurse did think that she was self-harming Alright, when she had this abscess In her head The two subordinate deputies did not believe that They had been watching her closely and they said We do not believe they're self-harming They reported that to Lieutenant Whittaker The record reflects that Lieutenant Whittaker Said, and this is Deputy Kelly's testimony In her deposition that's in the record That I will inform medical That was not done So think about that Not only did they do nothing But when a subordinate came up and said medical's assumption As to the diagnosis that's causing these problems And placing this person at extreme risk Is wrong And they did nothing And they went a step further When these subordinates, it was Deputy Kelly predominantly And Deputy Hill, were coming up to Lieutenant Rydell, Mrs. Rydell They were saying We don't think she's getting enough That something needs to be done again and again and again And they went around Rydell And they went directly to medical And what did Rydell do? He said stay in your lab He was actually restricting the flow of information Not just doing nothing But restricting the flow of information Regarding her circumstance And how she was supposed to be treated The facts are to be taken as you But when we actually look at them, it's worse than doing nothing The predominant argument by my colleague Mr. Lindeman Is that this is not a clearly established white Judge Rushing, you hit that right on the head There is precedent that when we're seeing An actual known risk that places this person At severe harm, that as a detainee Whether it's being post-conviction in the 8th Amendment Or in the 14th Amendment, a pretrial detainee Failing to do nothing This is pretrial, right? This is pretrial, your honor, and one of the good things about this And how it was decided by Judge Lyden, it's very similar to Short And you noted this, Judge Rushing Is that she did both the pre-short Subjective test, right? And we did the post-short objective test Right, because there, for qualified immunity For clearly established, she She looked at the pre-short standard Because that's what the officers were operating under at the time Correct, and then we know From the deliberate indifference standard in pre-short The second prong of that, right? And we're kind of actual knowledge of risk And a deliberate indifference to that That generally you're not even entitled to qualified immunity It's at this court held in Thorpe That we have a knowing violation of the law That culpable mindset, which comes through this case law That qualified immunity is not in play So what's interesting is The Supreme Court has said it is I mean, we've kind of gone back and forth on what's in Thorpe Right, and so if you go into Pafaller v. Ammonett They kind of give the two spectrums, right? You have the Taylor case, first you have the Thorpe case But I think the distinction in this court is what you're going to apply Is the direct action of the defendants And the known and obvious risk Kind of takes you out of the Taylor And puts you back into the Thorpe In fact, in your opinion, in Pafaller v. Ammonett They talk about that distinction And they say in jail cases That it's actually the most appropriate To the Thorpe analysis, because we actually have specific intent Or at least a culpable state of mind That they are violating the law So now how can they hide behind the shield of qualified immunity? I think I heard sort of a through line In Mr. Lindemann's argument The proposition that It would be dangerous precedent To require correctional officers To second-guess medical professionals What's your response to that? If it was a purely medical decision Yes, but similar to Short When they place them in solitary confinement And we have non-medical decisions that are impacting the care So it's not a second guess But they're actually decreasing the flow of information They're depriving this woman of talking Through medical grievances to her medical care And they're actually knowing That one of the bases and assumptions for the diagnosis Is incorrect based on the facts that they're observing Depriving that of getting to medical care We're not in second-guessing We're in prohibiting adequate medical care At that time Now, as you noted Judge Niemeyer I may not be able to prove that at trial And using medical professionals as cover Right And that's the IKO case You actually mentioned it in Short There were medical professionals done in IKO in Short I think the factual distinction would be how many times they were seen Albeit I don't think that really applied to the analysis But you don't get to hide behind the fact That somebody saw a nurse And then ignore obvious risks I mean one of the things that Is shocking in this case Is we talked about the last visit Of the doctor when they were in BMACS The observation that he made was that That abscess was about a half dollar By the end, we're at a grapefruit-sized head And it's not just the deputies that are noticing this The inmates are also reporting it This is obvious risk by a layperson That being relayed to these individuals Who are responsible for giving adequate medical care And they're not only doing nothing They are actually prohibiting that And I think that's what takes us out of this I mean we cannot give blank an immunity I think it would be more dangerous To say there is blank an immunity To non-medical personnel As long as they saw a nurse As long as they saw a doctor And then how many times do they have to see it And this is why when we go into this subjective test That that second prong is already clearly established Through the deliberate indifference second prong I mean that's where the case law has gone And I understand the distinction with Taylor But we're not in a protocol scenario, right? I mean Taylor was a suicide protocol Where he had an attenuation from the actual defendant So we're not in that standards We're actually in direct interaction And what's interesting is I think you can actually go into the cases That my friend Mr. Lindeman cites Just to kind of get the distinction When you rely on medical care We don't want our prison officers to have to be medical providers But those cases are like methadone overdoses About the amounts They're going to be when there's no serious injury And there's just a disagreement on the course of care In this case we had a deputy come To the lieutenants And say on my day off Can I please take her to the hospital It's obvious There is nothing that takes this We're only holding them liable for their own actions Not the actions of the medical personnel Albeit I think it's very negligent And at this point The court gave you facts To make that finding that they were on actual notice of the risk And they deliberately ignored that risk And so that second prong is satisfied Your honors I do want to Before the last thing I'll say Again I know I've got plenty of time left And I'm happy to answer any questions y'all have on the second amendment prong But hearing no questions I think I've addressed them From your discussion with Mr. Lindemann There was stuff in the brief about the consideration of the materials Because we had the ongoing state court case At the same time as the 1983 This is in the brief it wasn't raised in his oral argument I would note to the extent that That argument is raised in reply The district court in footnote four said she didn't consider Those materials I don't think it's jurisdictionally in front of you anyway Let me ask you It was a curiosity I saw that she didn't And probably isolated that Data But Would a jury's fact finding That Overlapped with the constitutional claim Is there any claim preclusion As to that I do not believe there is any claim preclusion As to that In fact if we're going to consider it What's fascinating about this case And just to give you an idea If you're thinking about the state court case There was a reckless finding in that For these exact actions under gross negligence In South Carolina law And the way it was described in that Which I think is apt for what we're thinking about In this interplay of consulting with medical professionals And the duty of these supervisory lieutenants Is in closing argument Actually Mr. Henson And I know we're not considering the state court But this is just to frame the issue He said to think about it this way If I take my child To a pulmonologist For breathing bad And that pulmonologist says I've got it The diagnosis is she's allergic to cats And the cat in your house is exacerbating that allergy And as the parent I know there's no cat What am I going to do? I'm going to say you're wrong In this case we have medical professionals saying This is attributable to self-infliction And people are watching her and they know it's not self-inflicted Yet nothing is being relayed And they're actually being prohibited From relaying that to medical professionals And then just to add one inference That can be drawn from this As I was preparing for this argument With this contention that these people Were not deliberately indifferent When she's in BMACs For days these people are reporting that she's self-inflicting That's what the diagnosis is And we're going from a half dollar to a grapefruit If we were giving adequate safety protections To a prisoner Wouldn't you think there would be some Restrictions to prevent that self-harm? Not only ignoring the medical But even the diagnosis of self-harm That can lead to further harm to this person And absolute risk They're ignoring that and doing nothing about it So either way you slice it There's just not an argument That the second prong of the qualified immunity analysis Was not satisfied Especially from the factual findings by judge Well it has to be based on the factual findings Of the plaintiff taken most favorably to the plaintiff Without question your honor And I've always been told to not talk when I don't need to So unless anybody has any questions I'll rest on my briefs Thank you Once again I didn't hear a single case That was cited to this court That addresses that there's a Constitutional duty Under a factual scenario such as this For correctional officers Knowing that there's ongoing medical care Provided to a detainee To second guess Those medical opinions Or medical decision making You reframe the facts by calling It second guessing When the second guessing Is not a medical conclusion But the second guessing is whether it's Self-inflicted And the officers Noted that it was not That it was growing And that she was unable to report it And they reported it Now why would two of them Observing her who's got this Grapefruit sized cyst And she's fainting And she's vomiting Why would they Go and report That Serious medical condition And then nothing's done in reaction The response was Nothing right Whitaker did nothing In other words When that report came from the two officers It hit a dead end Factually What happened She continued to receive medical care She continued And again I would encourage the court To look at the complaint itself On page 20 Of the joint appendix Paragraph 27 SHP medical records dated May 28th To reflect that medical staff Responded to BMACS To deal with the Plaintiff Paragraph 28 the very next day You can't just stick with that you gotta go to all the facts right We're talking about a summary judgment record In which you take The facts most favorable to the plaintiff Which I don't think you're doing Myself To be fair The plaintiff has a story That basically I was in Medical distress Serious medical distress And correctional officers Observed the extreme medical Thing And they reported it Upline And it went nowhere Nothing was done in response to their report It didn't go nowhere she continued to receive Medical care on numerous Encounters Except you have to focus on What Whitaker said and what the nurse said That's the response to what the officer said They said we need something now Not we don't need this Ongoing what they said is The nurse said it's self inflicted Right no the The allegation was that One of the nurses yes that nurse Donna Said it was self inflicting and what did Whitaker say There's no Evidence specifically as far as what Whitaker Said I believe Who was the officer Lieutenant they reported to These two officers Reported right ultimately Nurse Kelly Reported to Lieutenant Rydell What did Rydell say And Rydell said he was not In a position to be able to override Medical So then one of those Other correctional officers Went actually to medical And reported I don't Think this is self inflicted And we need more help Here and then One of the appellants said stay In your lane or something but again This whole well is that accurate is that Accurate that that's what that's what The allegation yes but what's What's key is that Whether it was self inflicting Or not she wasn't denied medical Care she continued to receive It and received ongoing medical right And you and your argument is that As long it sounds like as long As there's medical care it Does not matter what the Facts and circumstances are the Correctional officers have cover Under a scenario like this and that's a dangerous Precedent where they cannot Diagnose that it would be that the Medical care was inappropriate She was receiving medical Care it's not up to these officers Or that see that wasn't a diagnosis That self infliction And that's what they were doubting That this was self inflicted Because that's what they were told and They said it doesn't it's not self Inflicted and the I think wasn't there evidence that inmates Observe that too but your honor Whether it was self inflicted or not So yes and I want to get to my question my Question was that There that is not second Guessing a medical decision that's Second guessing a causative decision Of whether she self inflicted Or not and the Point is the officers Had good reason good reason To doubt that This was self inflicted and yet They were not accommodated But whether it was self inflicted or Not that would be pertinent If the nurses said it's self Inflicted and we're not providing any medical Care that's not the undisputed Evidence in this case whether The nurses well first of all nurse Donna Denied ever alleging that it was self Inflicted but the bottom line is She continued to receive medical Care if somebody self inflicts in A prison they're provided medical Care even if they self inflict that's not a Basis for not providing medical Care and in this particular case she was Continuing to receive medical care A CT scan was ordered for her on May 28th by Dr. Williams ultimately Was it conducted on May 28th No it was scheduled for May 5th I mean June 5th and she was in the hospital by that I know so Ultimately it's hardly useful is it Well I mean she's lying on The floor vomiting And with a fever and With this grapefruit size and they Say we schedule something five days in advance Or six days in advance I mean something's got to be Done right now doesn't it Well ultimately they Were providing care and you can't expect These officers To second guess that I think it boils down to that If I can make one additional point I see my Time's up it is up but go ahead I just wanted to cite this Court in Rice vs. Adams In 2026 I think Your Honor Judge Neimeyer you were a part of this case Specifically said this that medical Professionals examined Rice several times As detailed in the complaint Further undermines any inference That the officers acted with deliberate Indifference even if they Should have known that she was undergoing Withdrawal for when a detainee is under The care of medical experts detention Officers will generally be justified In believing that the detainee is Incapable hands Whitaker and Rydell were justified In believing that they were incapable hands That Miss Rhodes was incapable Hands and certainly there's No case law no authority to Suggest they had a duty to Seek any type of alternative care For her and therefore she would be entitled To or these officers would be entitled To qualified immunity Thank you thank you We'll come down and greet counsel And proceed on the last case
judges: Paul V. Niemeyer, Stephanie D. Thacker, Allison J. Rushing